1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    BALSAM BRANDS INC., et al.,                Case No. 15-cv-04829-WHO
8              Plaintiffs,                      **ORDER DENYING REQUEST FOR**
                                                **TEMPORARY RESTRAINING ORDER**
9         v.
                                                Re: Dkt. No. 11
10   CINMAR, LLC, et al.,
11             Defendants.
12                           **INTRODUCTION**
13        Plaintiffs Balsam Brands Inc. and Balsam International Limited (collectively, "plaintiffs")
14   seek a temporary restraining order to protect their ability to market and sell an invertible artificial
15   Christmas tree, the "Flip Tree," that includes a "pivot joint" in the trunk that separates the trunk
16   into two parts and allows the tree to fold for simplified set up and storage.  They allege that they
17   hold rights in two patents on the Flip Tree, and that defendants Cinmar, LLC dba Frontgate /
18   Grandin Road and Frontgate Marketing, Inc. (collectively, "Frontgate") are advertising and selling
19   invertible artificial Christmas trees that infringe those patents.  On the basis of these allegations,
20   plaintiffs bring five causes of action against Frontgate – (1) patent infringement in violation of 35
21   U.S.C. § 271(a); (2) false marking in violation of 35 U.S.C. § 292; (3) false advertising in
22   violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) violations of California's
23   Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; and (5) violations of
24   California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.* – and now
25   seek to enjoin Frontgate from making, using, offering to sell, selling, importing, or falsely
26   advertising the accused trees.
27        Plaintiffs are not entitled to a TRO.  As of the hearing on November 3, 2015, plaintiffs had
28   clearly failed to establish that they had standing to sue for infringement of the patents-in-suit.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Their supplemental filing three days after the hearing makes the standing question less clear, but it

2   still falls short of adequately demonstrating standing at this juncture.  In addition, Frontgate has

3   raised a substantial question regarding infringement by the accused trees.  Each of these

4   deficiencies precludes plaintiffs from obtaining a TRO on the basis of their patent infringement

5   claims.  This leaves their non-patent-infringement causes of action, but the record does not come

6   close to establishing a likelihood of irreparable harm flowing from the alleged misconduct

7   underlying those claims.  Plaintiffs' request for a TRO is DENIED.

8                                    **LEGAL STANDARD**

9          "The standard for issuance of a temporary restraining order is the same as that for issuance

10  of a preliminary injunction."  *Burgess v. Forbes,* No. 09-cv-00629-JF, 2009 WL 416843, at *2

11  (N.D. Cal. Feb. 19, 2009); *accord XimpleWare Corp. v. Versata Software, Inc.*, No. 13-cv-05160-

12  SI, 2013 WL 6405979, at *2 (N.D. Cal. Dec. 6, 2013).  "[A] preliminary injunction is an

13  extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear*

14  *showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

15  (emphasis in original).  "A plaintiff seeking a preliminary injunction must establish that he is

16  likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

17  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

18  public interest."  *Winter v. Natural Res. Def. Council Inc.*, 555 U.S. 7, 20 (2008); *accord Titan*

19  *Tire Corp. v. Case New Holland Inc.*, 566 F.3d 1372, 1375-76 (Fed. Cir. 2009).

20         Under Federal Circuit precedent, "the movant must establish at the very least both of the

21  first two factors, i.e., a likelihood of success on the merits and irreparable harm."  *Anton/Bauer,*

22  *Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed. Cir. 2003).  "If the accused infringer raises a

23  substantial question concerning either infringement or validity, then the patentee has not

24  established that it is likely to succeed on the merits, and a preliminary injunction is not

25  appropriate."  *LifeScan Scotland, Ltd. v. Shasta Technologies, LLC*, 734 F.3d 1361, 1366 (Fed.

26  Cir. 2013) (internal quotation marks omitted).

27         "Where an issue is not unique to patent law, [the Federal Circuit] appl[ies] the law of the

28  regional circuit from which the case arises."  *Allergan Inc. v. Athena Cosmetics Inc.*, 738 F.3d

2

1350, 1354 (Fed. Cir. 2013).  In the Ninth Circuit, if the plaintiff cannot establish that he is likely to succeed on the merits, he may still obtain an injunction if he shows that he has raised "serious questions going to the merits" and that the balance of hardships "tips sharply" in his favor, so long as he also shows that the other two *Winter* factors are satisfied, i.e., that there is a likelihood of irreparable injury and that the injunction is in the public interest.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011); *accord Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1081 (9th Cir. 2015).

## DISCUSSION

## I.   PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THEIR PATENT INFRINGEMENT CLAIMS.

### A.   Plaintiffs have not adequately demonstrated that they have standing to sue for infringement of the patents-in-suit.

The standing issue in this case is made significantly more complicated by the fact that plaintiffs submitted the bulk of their evidence regarding standing several days *after* the TRO hearing on November 3, 2015.  As of the hearing, it was clear that plaintiffs lacked standing to sue for infringement of the patents-in-suit.  The evidence submitted after the hearing muddies the standing issue, but it leaves substantial questions as to whether plaintiffs may in fact pursue their claims for infringement.  *See Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1571-74 (Fed. Cir. 1991) (vacating preliminary injunction where the evidence "raises a serious question about the nature of the title [in the patent]," such that "it cannot be said on this record that [the plaintiff] has established a reasonable likelihood of success on the merits").

Under Federal Circuit precedent, "only a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit."  *Spine Solutions Inc. v. Medtronic Sofamor Danek USA Inc.*, 620 F.3d 1305, 1317 (Fed. Cir. 2010) (internal quotation marks omitted).  To qualify as an exclusive licensee for the purposes of standing to sue for patent infringement,

> a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well. If the party has not received an express or implied promise of exclusivity under the patent, i.e., the right to exclude others from making, using, or selling the patented invention, the party has only a bare license – and a bare license to sell an invention in a specified territory, even if it is the

3

1    only license granted by the patentee, does not provide standing
     without the grant of a right to exclude others.

2  *Id.* (internal quotation marks, alterations and citations omitted).  An exclusive licensee may sue for

3  infringement so long as it is joined by the patent owner, while an exclusive licensee that holds "all

4  substantial rights" in the patent may commence an infringement action on its own.  *See Aspex*

5  *Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1340 (Fed. Cir. 2006); *Sicom Sys., Ltd. v.*

6  *Agilent Technologies, Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) ("A nonexclusive license confers

7  no constitutional standing on the licensee to bring suit or even to join a suit with the patentee

8  because a nonexclusive licensee suffers no legal injury from infringement.").  Courts applying

9  these rules have repeatedly held that the mere fact that "a corporate parent's subsidiary owns a

10  patent is not enough to establish that the [corporate] parent has rights in the subsidiary's paten[t]."

11  *Top Victory Electronics v. Hitachi Ltd.*, No. 10-cv-01579-CRB, 2010 WL 4722482, at *3 (N.D.

12  Cal. Nov. 15, 2010); *see also Spine Solutions*, 620 F.3d at 1317-18 (holding that parent

13  corporation lacked standing to sue for infringement of subsidiary's patent where "nothing in the

14  record indicates that [the parent corporation] is an owner or exclusive licensee of the . . . patent");

15  *Digitech Image Techs., LLC v. Newegg Inc.*, No. 12-cv-01688, 2013 WL 1871513, at *3 (C.D.

16  Cal. May 3, 2013).

17      The patents-in-suit are U.S. Patent Nos. 8,062,718 (the '718 patent) and 8,993,077 (the

18  '077 patent), both of which are entitled, "Invertible Christmas Tree."  *See* Compl. ¶¶ 20-21, Exs.

19  A-B (Dkt. No. 1).  As of the hearing, the only relevant evidence of record indicated that the

20  assignee of the patents was Balsam Hill LLC.[1]  *See* Grier Decl. Ex. B (Dkt. No. 27-1); Harman

21  Decl. ¶ 13 (Dkt. No. 14).  Balsam Hill LLC is not a party to this case; the plaintiffs in this case are

22  Balsam Brands Inc. and Balsam International Limited.  *See, e.g.,* Compl. ¶¶ 15-16.  Balsam Hill

23  LLC is a subsidiary of Balsam Brands Inc.  *See* Harman Decl. ¶ 13.

24      As of the hearing, not only was there no evidence in the record indicating that either

25  Balsam Brands Inc. or Balsam International Limited held legal title to either of the patents-in-suit,

26  but there was no evidence indicating that either plaintiff was an exclusive licensee of either patent.

27

28  ────────────
    [1] The materials submitted after the hearing, as they impact the standing issue, are discussed below.

United States District Court
Northern District of California

Plaintiffs had stated that the Flip Tree practices the patents-in-suit, and that "given the importance of the Flip Tree technology to our brand, Balsam Hill has never licensed or offered to license the Flip Tree patents outside of the Balsam Hill family, and certainly not to Frontgate or any entity affiliated with it."  Harman Decl. ¶ 15.  But this is not the same as showing that plaintiffs are exclusive licensees.  Standing alone, the facts that Balsam Hill LLC is a subsidiary of Balsam Brands Inc., and that the "Balsam Hill family"[2] is the only group of entities that practices the patented technology, is not enough to establish an exclusive licensing agreement.  *See Spine Solutions*, 620 F.3d at 1318 ("[T]he fact that [the patent-holding corporation's sister corporation] is currently the only entity practicing the . . . patent does not mean that [the patent-holding corporation] has promised to exclude all others from doing so.  Nothing in the record shows that [the patent-holding corporation] would be prohibited from licensing the . . . patent to a third party, should it so desire.").[3]

At the hearing, plaintiffs did not dispute that, based on the record as it stood at that time, they lacked standing to sue for infringement of the patents-in-suit.  They claimed instead that they were in possession of other documents not yet in the record that would establish standing.[4]  I

---

[2] Plaintiffs did not provide a definition for this term.

[3] While the Federal Circuit has been clear that an entity must either own or possess an exclusive license to a patent to seek *legal* remedies for infringement, the court has also held that in some circumstances an entity with "equitable title" to a patent may have standing to sue for *equitable* remedies.  *See, e.g., Arachnid Inc. v. Merit Indus. Inc.*, 939 F.2d 1574, 1579-81 (Fed. Cir. 1991).  Plaintiffs have not raised this argument in this case, however, and the Federal Circuit has not held that the equitable title doctrine automatically applies between a parent corporation and its patent-holding subsidiary.  Meanwhile, several district courts have explicitly rejected this position.  *See Top Victory*, 2010 WL 4722482, at *3 ("a parent corporation does not have equitable title in a patent solely by virtue of its ownership of the subsidiary") (internal quotation marks and alterations omitted); *Steelcase Inc. v. Smart Technologies Inc.*, 336 F. Supp. 2d 714, 719 (W.D. Mich. 2004) (same); *see also Beam Laser Sys. Inc. v. Cox Commc'ns Inc.*, 117 F. Supp. 2d 515, 520-21 (E.D. Va. 2000) (holding that patent-holding corporation's sole shareholder, an individual, did not have equitable title in the corporation's patents).

[4] Plaintiffs also stated at the hearing that earlier that morning they had provided Frontgate with documents showing that the patents-in-suit had been assigned from Balsam Hill LLC to the Harman Family Revocable Trust, and from the Harman Family Revocable Trust to Balsam International Limited.  *See* Penden Decl. Exs. A-B (Dkt. No. 40-3).  However, both of those documents were executed on November 2, 2015, the day before the TRO hearing.  *See id.*  Plaintiffs appear to have abandoned any reliance on those documents to establish their standing, and they now focus instead on the documents they submitted on November 6, 2015.

United States District Court
Northern District of California

granted their request to submit the documents, Dkt. Nos. 33, 35, and on Friday, November 6, 2015, three days after the hearing, plaintiffs finally did so.  Dkt. No. 37.  Frontgate responded the following Monday, November 9, 2015 by moving to strike the documents from the record and arguing that, in any event, they fail to make a sufficient showing of standing for the purposes of this TRO request.  *See* Dkt. No. 40-3 ("Mot. to Strike").[5]

The documents consist of what plaintiffs identify as (1) an "Asset Purchase Agreement" dated December 31, 2013 between Bruce Schooley (the named inventor of the patents-in-suit) and Balsam Hill LLC; (2) a "Distribution and Assignment Agreement" effective December 30, 2014 between Balsam Hill LLC, Balsam Brands Group LLC, and the Harman Family Revocable Trust; (3) a "Second Asset Purchase Agreement" between the Harman Family Revocable Trust and Balsam International Limited; and (4) a revised version of the "Distribution and Assignment Agreement" dated October 16, 2015.  *See* Dkt. No. 37.

The agreements fail to establish standing for either Balsam Brands Inc. or Balsam International Limited for several reasons.  First, despite being filed under seal, significant portions of the agreements are redacted, and no unredacted versions have been filed with the Court or served on Frontgate.  *See* Peden Decl. ¶ 5 (Dkt. No. 40-3).  Plaintiffs do not explain why this is the case.  Plaintiffs cannot expect me to rely on these agreements to find that they have established standing when they have not provided me with complete, unredacted copies.  *Cf. Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1344 (Fed. Cir. 2001) ("The title of the agreement at issue . . . is not determinative of the nature of the rights transferred under the agreement; actual consideration of the rights transferred is the linchpin of such a determination."); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001) (explaining that a party claiming that it has "all substantial rights" in a patent "must produce [a] written instrumen[t] documenting the transfer of proprietary rights," and that determining

---

[5] Frontgate's request to strike the documents is DENIED.  By November 13, 2015, plaintiffs shall file with the Court and serve on Frontgate unredacted versions of the documents.  If plaintiffs wish to file the unredacted versions under seal, they shall do so pursuant to Civil Local Rule 79-5 and my Standing Order on Administrative Motions to File Under Seal.  I will look to plaintiffs' sealing motion, if any, in deciding whether the redacted versions of the documents they submitted on November 6, 2015 may remain under seal.

United States District Court
Northern District of California

1   whether an agreement transfers all substantial rights requires a court to "ascertain the intention of

2   the parties and examine the substance of what was granted by the agreement").  As Frontgate

3   observes, to find otherwise would be to allow plaintiffs to "cherry-pick" those portions of the

4   agreements that serve their standing argument, while withholding those portions that undermine it.

5   *See* Mot. to Strike at 11-12.  Moreover, the agreements – which were not shared either with the

6   Court or with Frontgate until after the hearing – are only properly considered at this juncture if

7   Frontgate is given an opportunity to respond.  *See El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032,

8   1040-41 (9th Cir. 2003); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).  By serving

9   Frontgate with the agreements more than two days after filing them with the Court, and then

10   serving it with only redacted versions, plaintiffs have substantially interfered with that

11   opportunity.[6]

12          Second, plaintiffs offer no explanation or analysis of the agreements.  The only

13   accompanying filing is a declaration from Nathaniel Roland, general counsel of "Balsam Brands

14   Inc. and its affiliates," who succinctly identifies each of the agreements and excerpts certain of

15   their provisions.  *See* Roland Decl. ¶¶ 1-16 (Dkt. No. 37).  Roland does not explain how these

16   provisions impact the ownership or licensing of the patents-in-suit, or what the ultimate

17   consequences of the agreements are – e.g., which entity now holds title to the patents-in-suit, or

18   which if any entity holds an exclusive license to them.  Roland does not even state that the

19   agreements establish standing; he merely states that his declaration "concerns the ownership" of

20   the patents-in-suit.  *See id.* ¶ 2.  Contrary to plaintiffs' apparent assumption, the agreements are

21   not self-explanatory, in particular in light of their complex interlocking nature, their significant

22   redactions, and the odd manner in which they have surfaced in this case.  It is plaintiffs' burden to

23   establish their standing to sue for infringement of the patents-in-suit.  *See MHL TEK, LLC v.*

24   *Nissan Motor Co.*, 655 F.3d 1266, 1274 (Fed. Cir. 2011).  In the circumstances of this case,

25   merely submitting the agreements without any meaningful explanation or analysis does not satisfy

26

27   ──────────────────
     [6] Plaintiffs did not serve the agreements on Frontgate until Sunday, November 8, 2015 at 7:18
28   p.m.  *See* Peden Decl. ¶ 5.  Because the documents were filed under seal, Frontgate did not have
     access to the agreements until that time.

1    that burden.

2         The third problem with the agreements is specific to Balsam Brands Inc.  Plaintiffs do not

3    identify, and I have not found, any aspect of the agreements that reflects a transfer of rights in the

4    patents-in-suit to Balsam Brands Inc.  *See* Mot. to Strike at 12 (observing same).  In other words,

5    despite plaintiffs' supplemental filing, there remains no evidence in the record indicating that

6    Balsam Brands Inc. has standing.  This is significant because, as discussed in more detail below,

7    the only evidence that plaintiffs offer in support of their claim of irreparable harm is the

8    declaration of Thomas Harman, the cofounder and CEO of Balsam Brands Inc.  *See* Harman Decl.

9    ¶¶ 17-21.  Although the declaration is unclear on which if any of the Balsam entities it applies to

10   apart from Balsam Brands Inc., there is no indication that the purported irreparable injuries it

11   describes apply to Balsam International Limited.  *See id.*  A showing that Balsam Brands Inc. is

12   likely to suffer irreparable harm is not equivalent to a showing that Balsam International Limited

13   is likely to suffer the same.  *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1329 (Fed. Cir. 2008)

14   (upholding denial of a permanent injunction where the plaintiff "attempted to prove irreparable

15   injury by alleging irreparable harm to his exclusive licensee rather than himself"); *cf. Poly-Am.,*

16   *L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310-11 (Fed. Cir. 2004) (holding that patentee

17   corporation could not recover damages based on the lost profits of its sister corporation, even

18   though the two corporations "share[d] interests as two entities collaborating in the manufacture

19   and sale" of a product; reasoning that the entities "may not enjoy the advantages of their separate

20   corporate structure and, at the same time, avoid the consequential limitations of that structure").

21   Accordingly, without more information regarding Balsam International Limited's activities and its

22   relationship with Balsam Brands Inc. – of which there is very little in the record – the evidence

23   regarding Balsam Brands Inc.'s likely irreparable harm cannot be imputed to Balsam International

24   Limited.  The upshot is that for plaintiffs to obtain a TRO based on their patent infringement

25   claims and their current showing of irreparable harm, they must at the very least show that Balsam

26   Brands Inc. has standing.  *See Anton/Bauer*, 329 F.3d at 1348 ("the movant must establish at the

27   very least both of the first two factors, i.e., a likelihood of success on the merits and irreparable

28   harm").  Neither the materials submitted before the hearing nor the supplemental filing comes

close to doing so.

**B.      Frontgate has raised a substantial question concerning infringement.**

An additional reason that plaintiffs have failed to establish a likelihood of success on the merits of their patent infringement claims is that Frontgate has raised a substantial question that the accused trees do not infringe the patents-in-suit.

To demonstrate a likelihood of success on the merits, a patentee must show, in light of the burdens that will inhere at trial, (1) that it will likely prove infringement, and (2) that any challenges to the validity and enforceability of the patent lack substantial merit. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51 (Fed. Cir. 2001); *accord Anton/Bauer*, 329 F.3d at 1348. As at other phases of the case, the "infringement and validity analyses must be performed on a claim-by-claim basis." *Amazon*, 239 F.3d at 1351. Thus, "in cases involving multiple patent claims, to demonstrate a likelihood of success on the merits, the patentee must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer."[7] *Id.*

Determining infringement requires a two-step analysis. "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citations omitted). "Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted clai[m]." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id.* In conducting the first step of the infringement analysis and construing the scope of a claim for the purposes of a request for a TRO or preliminary injunction, the court is not required to construe the claim "finally and conclusively." *Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*,

---

[7] Frontgate contends that there are substantial questions concerning both the infringement of each asserted claim and the validity of each of the patents-in-suit. Because I find that Frontgate has raised a substantial question concerning the infringement of each asserted claim, I do not address the validity argument.

United States District Court
Northern District of California

74 F.3d 1216, 1221 (Fed. Cir. 1996).  Rather, the court "may engage in a rolling claim construction, in which [it] revisits and alters its interpretation of the claim terms as its understanding of the technology evolves."  *Jack Guttman*, *Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002).

Plaintiffs contend that Frongate infringes claims 1 and 4 of the '718 patent and claims 11 and 14 of the '077 patent.  Compl. ¶ 23; TRO App. at 13-14 (Dkt. No. 11).  The claims are as follows:

**'718 patent:**

1. A collapsible Christmas tree, comprising in combination:

a first trunk portion;

said first trunk portion having an elongate form extending between an upper end and a lower end, said upper end above said lower end when said first trunk portion is supported upon a floor;

a second trunk portion having an elongate form between a first end and a second end; said second trunk portion including a plurality of limbs extending laterally therefrom;

a pivot joint coupling said first trunk portion to said second trunk portion in a manner allowing pivoting of said second trunk portion relative to said first trunk portion;

said pivot joint interfacing with said first trunk portion at a location closer to said upper end than to said lower end;

and said pivot joint interfacing with said second trunk portion at a location spaced from both said first end and said second end of said second trunk portion.

4. The collapsible Christmas tree of claim 1 wherein said pivot joint allows for at least about 180° of rotation of said second trunk portion relative to said first trunk portion.

**'077 patent:**

11. An artificial tree, comprising:

a fixed trunk portion with an upper end above a lower end;

a rotating trunk with a first end opposite a second end;

said rotating trunk pivotably joined to said fixed trunk at a location between said first end and said second end;

and a plurality of limbs extending laterally from said rotating trunk.

United States District Court
Northern District of California

10

14. The artificial tree of claim 11 wherein said plurality of limbs are pivotably attached to said rotating trunk, such that said limbs can pivot by gravity from a collapsed position to a deployed position with tips of said limbs closer to said rotating trunk when said limbs are in said collapsed position than in said deployed position.

'718 patent at 17:9-28, 39-41; '077 patent at 18:14-20, 30-35.

Frontgate focuses its noninfringement argument on the terms "pivot joint" in claim 1 of the '718 patent and "pivotably joined" in claim 11 of the '077 patent. *See* Opp. at 9-11. Its expert, Irving Rappaport, construes "pivot joint" as "a joint permitting rotation of the first trunk portion relative to the second trunk portion about one or more fixed points of rotation," and "pivotably joined" as "joined to permit rotation of the rotating trunk relative to the fixed trunk about one or more fixed points of rotation." Rappaport Decl. ¶¶ 42, 54 (Dkt. No. 26). Frontgate argues that, in contrast with the technology covered by the asserted claims, the mechanism (which the parties describe as a "slotted hinge") that allows Frontgate's trees to fold does not contain any "fixed points of rotation" and employs "translational, not rotational movement." *Id.* ¶ 69. In other words, rather than relying on a "pivot joint" or being "pivotably joined," the slotted hinge mechanism that allows Frontgate's trees to fold is a "track mechanism" that "rel[ies] on combinations of translational movement" and "physically moves the location of the trunk, causing a flipping of the trunk."[8] Opp. at 10.

Frontgate purchases the accused trees from UCP International Co. Ltd., which has filed a patent application on the slotted hinge used in the trees. Grier Decl. Ex. A (Dkt. No. 27). The patent application includes the following diagrams:

---

[8] The parties do not dispute that all of the accused trees are materially identical for the purposes of this infringement analysis.

United States District Court
Northern District of California



**FIG. 1c**                                      **FIG. 2b**

*Id.* As used in the accused trees, the slotted hinge appears as follows:





Loomis Decl. ¶ 37 (Dkt. No. 12).

Plaintiffs contend that the asserted claims still cover the accused trees, despite their use of the slotted hinge. Their expert, Jason Loomis, broadly construes "pivot joint" as "a joint permitting rotation of one of the connected parts with respect to the other," and "pivotably joined" as "mechanically connected to permit rotation." *Id.* ¶¶ 23, 25.

I agree with Frontgate that these constructions are not supported by either the intrinsic or the extrinsic evidence in this case. The appropriate starting point of claim construction "is always with the language of the asserted claim itself." *Comark Commc'ns Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). A claim term is "generally given [its] ordinary and customary meaning," that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," who "read[s] the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)

1    (internal quotation marks omitted).  "In light of the statutory directive that the inventor provide a

2    'full' and 'exact' description of the claimed invention, the specification necessarily informs the

3    proper construction of the claims."  *Id.* (quoting 35 U.S.C. § 112).

4            Plaintiffs fail to identify any aspect of the asserted claims, the specifications, or any other

5    portion of the patents-in-suit that supports their broad constructions of "pivot joint" and "pivotably

6    joined."  Frontgate, on the other hand, observes that every instance of a "pivot joint," "pivot," and

7    "joint" in the specifications for both patents-in-suit conforms to its constructions of the disputed

8    terms.[9]  *See* Rappaport Decl. ¶¶ 43, 55.  Plaintiffs offer nothing that calls into question this

9    observation.  They highlight the following figure, which appears in both specifications and is

10   described as an alternative embodiment of the claimed pivot joint:



Fig. 18

24   '718 patent at Fig. 18, 7:49-62; '077 patent at Fig. 18, 7:49-62.  But even this figure depicts a

25   pivot joint that "permit[s] rotation . . . about one or more fixed points of rotation" and thus

27   _____

28   [9] The term "pivotably joined" does not appear in the specification for either patent.  The terms
     "pivotably attached," "pivotably coupled," and "pivotably connected" do appear in the
     specifications, but plaintiffs do not point this out, much less explain how the way in which the
     terms are used supports their position.

conforms to Frontgate's constructions.

Of course, while the specification "may shed contextual light on the plain and ordinary meaning[,] [it] cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). But there is no indication here that the plain and ordinary meanings of "pivot joint" and "pivotably joined" extend, as plaintiffs urge, to literally *all* mechanical connections that permit rotation between connected parts. *See* Loomis Decl. ¶¶ 23, 25. The intrinsic evidence does not support this position, and the only extrinsic evidence on record is two dictionary definitions submitted by Frontgate. *See* Rappaport Decl. ¶¶ 48-50, Exs. B-C. While I do not find that either of those dictionary definitions is particularly useful in construing the disputed terms, I note that neither provides meaningful support for plaintiffs' constructions.

Accordingly, of the claim constructions offered by the parties, I am persuaded at this juncture that Frontgate's are the superior ones. Under those constructions, there is clearly a substantial question as to whether the accused trees literally infringe, and plaintiffs' expert offers no opinions on infringement under the doctrine of equivalents. *See* Loomis Decl. ¶ 50.

Plaintiffs have not established a likelihood of success on their patent infringement claims.

## II.   PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM BASED ON THEIR OTHER CAUSES OF ACTION.

This leaves plaintiffs non-patent-infringement causes of action for (1) false marking in violation of 35 U.S.C. § 292, (2) false advertising in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), (3) violations of the UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*, and (4) violations of the FAL, Cal. Bus. & Prof. Code § 17500 *et seq.*

Each of these four causes of action is predicated on one or both of the following allegations: (1) Frontgate has marketed the accused trees as "featuring patented inversion technology," but Frontgate lacks patent rights in the inversion technology featured in the trees; and (2) Frontgate has marketed the accused trees as featuring "exclusive inversion technology," but the inversion technology featured in the trees is not exclusive to it, because plaintiffs also use the

same technology.  *See, e.g.,* TRO App. at 14-18.

Irrespective of the merits of these claims, plaintiffs are not entitled to a TRO based on them because plaintiffs have not established that they are likely to be irreparably harmed by the alleged misconduct underlying them.  *See XimpleWare*, 2013 WL 6405979, at *3 (denying application for TRO based only on movant's failure to show likelihood of irreparable harm); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, No. 13-cv-03717-NC, 2015 WL 3466314, at *8-9 (N.D. Cal. May 29, 2015) (same, with respect to motion for preliminary injunction); *see also Becker v. Wells Fargo Bank, NA, Inc.*, No. 10-cv-02799, 2012 WL 5289326, at *5 n.5 (E.D. Cal. Oct. 23, 2012).

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  The mere "possibility" of irreparable harm is not enough to justify a preliminary injunction.  As the Supreme Court made clear in *Winter*, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." 555 U.S. at 22; *see also Cottrell*, 632 F.3d at 1131 ("Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.") (emphasis omitted).  The threat of irreparable harm must also be "immediate" to warrant preliminary injunctive relief.  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

As noted above, the only evidence that plaintiffs offer in support of their claim to irreparable harm is the declaration from Thomas Harman, the cofounder and CEO of Balsam Brands Inc.  The declaration states in relevant part:

> 17. Based on Frontgate's holiday marketing promotions in past years, Balsam expects Frontgate to advertise a variety of price promotions and discounts throughout the Christmas selling season. For example, over the October 24 weekend, Frontgate is offering $50 back for every $200 spent, resulting in a 25% discount. Balsam will soon need to decide whether to lower its own prices to compete with Frontgate's infringing products.

United States District Court
Northern District of California

18. Frontgate's sale of infringing invertible trees, and its false advertising claiming it's the exclusive provider of such trees and that it even owns the patent on them, erodes Balsam Hill's identity as an innovation leader. Frontgate's actions also discredit our marketing campaign promoting our exclusive right to the Flip Trees.

19. Frontgate's actions are also costing us sales and market share. Catalog and ecommerce businesses depend on acquiring new customers and then benefiting from the lifetime value of those customers. Typical ecommerce or catalog retailers like Frontgate may break even or even lose money on initial sales to new customers. Their strategy is to acquire customers and then build lifetime relationships that lead to downstream sales. Former Frontgate employees have told me that Frontgate in particular uses trees as its acquisition tool, and then later sells décor and many other products to those customers.

20. Each lifetime customer relationship Frontgate builds using infringing trees and false advertising is a lifetime relationship potentially lost to Balsam Hill. And because our brand and not just our Flip Tree is under fire, we also stand to lose downstream customers and sales across our whole product line. This includes conventional Christmas trees, wreaths, garlands, ornaments, stockings, tree skirts, and other products. These losses may last a lifetime.

21. Christmas trees are highly seasonal. Our business grows tremendously each week in October and November and hits a fever pitch by the Thanksgiving holiday weekend. Based on 2013 and 2014 sales data, we forecast that the revenues we have received through October 20, 2015 will constitute approximately 10% of our annual revenues this year. However, in the thirty days of November alone, Balsam Hill typically receives a staggering 50% of our annual revenues. Our sales are thus concentrated almost entirely around the Christmas season. A single poor Christmas season could be devastating to the company.

Harman Decl. ¶¶ 17-21.

The declaration does not establish a likelihood of irreparable harm as a result of Frontgate's

alleged false marking, Lanham Act, UCL, and FAL violations. The bulk of the statements

describe harms threatened by Frontgate's alleged infringing sales, not its alleged illegal

advertising. Harman does state that Frontgate's advertising "erodes Balsam Hill's identity as an

innovation leader," that Frontgate's actions "discredit our marketing campaign promoting our

exclusive right to the Flip Trees," and that "each lifetime customer relationship Frontgate builds

using infringing trees and false advertising is a lifetime relationship potentially lost to Balsam

Hill." *Id.* ¶¶ 18, 20. But without additional evidence indicating that these harms have in fact

1   occurred or are likely to occur, the notion that Frontgate's alleged illegal advertising will cause

2   them in the immediate future is too speculative to warrant injunctive relief.

3           Moreover, Frontgate submits a declaration from David Landis, the Vice President of

4   Finance and Treasurer of Cinmar, LLC, who states that Frontgate's description of its trees as

5   "featuring patented inversion technology" was based on its misunderstanding that the pending

6   application on the slotted hinge technology had already issued, and that Frontgate has since

7   removed the offending language from its website. *See* Landis Decl. ¶¶ 10-11 (Dkt. No. 23).

8   Plaintiffs do not dispute that the offending language is no longer on the website, and I take that fact

9   to be true. Frontgate's hard copy catalogs contain alleged illegal advertising, but the only

10  statements in those catalogs identified by plaintiffs are that Frontgate's trees feature "exclusive,

11  state-of-the-art technology guaranteed to make setup a snap," and that Frontgate's "exclusive new

12  Inversion tree goes from packed-away to put-up in about a minute." Fitton Decl. Ex. P (Dkt. No.

13  13-17). Plaintiffs have not shown that these statements are likely to cause them immediate harm

14  that cannot be adequately addressed by money damages.

15          Finally, although it is not dispositive, plaintiffs' delay in seeking a TRO further undercuts

16  their request. Plaintiffs state that they learned on August 18, 2015 that Frontgate was selling the

17  accused trees. Harman Decl. ¶ 16. Presumably, plaintiffs learned of Frontgate's alleged illegal

18  advertising at or around the same time. Yet plaintiffs did not file their complaint until October 20,

19  2015 and did not seek a TRO until October 26, 2015, just days before the start of the month when

20  plaintiffs state that they generally earn approximately 50 percent of their annual revenue. *See*

21  Harman Decl. ¶ 21 ("[I]n the thirty days of November alone, Balsam Hill typically receives a

22  staggering 50% of our annual revenues. Our sales are thus concentrated almost entirely around the

23  Christmas season. A single poor Christmas season could be devastating to the company."). While

24  this ten-week delay would be of little if any concern in most circumstances, given the extent to

25  which plaintiffs emphasize the importance of the holiday shopping season in claiming that they

26  will suffer irreparable harm, their failure to seek injunctive relief sooner further weighs against this

27

28

United States District Court
Northern District of California

18

1    claim.[10] *Cf. Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (in trademark

2    infringement case, delay of approximately ten weeks after plaintiff directly learned of alleged

3    misconduct, and approximately nine months after it was reported in the press, undercut claim of

4    irreparable harm).

### CONCLUSION

6          Plaintiffs' request for a temporary restraining order, and for the Court to issue an order to

7    show cause why a preliminary injunction should not be issued, is DENIED.  Frontgate's motion to

8    strike is also DENIED.  By November 16, 2015, plaintiffs shall file with the Court and serve on

9    Frontgate unredacted versions of the documents they filed on November 6, 2015 (Dkt. No. 37).  If

10    plaintiffs wish to file the unredacted versions under seal, they shall do so pursuant to Civil Local

11    Rule 79-5 and my Standing Order on Administrative Motions to File Under Seal.  I will look to

12    plaintiffs' sealing motion, if any, in deciding whether the redacted versions of the documents they

13    submitted on November 6, 2015 may remain under seal.

14          **IT IS SO ORDERED**.

15    Dated: November 12, 2015



WILLIAM H. ORRICK
United States District Judge

---

United States District Court
Northern District of California

[10] On the subject of delay, plaintiffs' delay in filing the documents in support of their standing argument – which plaintiffs' counsel represented at the hearing could be submitted "at any time" – does not help their case.  While three days is not a long period of delay, and I understand that there were some technical difficulties in filing the documents under seal, it is unclear why it took so long to get the documents on file, despite plaintiffs' claim of urgency in having their TRO request heard and decided as soon as possible.  Plaintiffs' failure to submit the documents before the November 3, 2015 hearing – or at the very least immediately following it – simply does not comport with the diligence that one would expect from a party that, according to its briefing, is in the process of suffering irreparable harm.